1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

FRED MOTT,                         )      No. C 03-0864 MMC (PR)
                                   )
11            Petitioner,          )      **ORDER DENYING PETITION FOR**
                                   )      **WRIT OF HABEAS CORPUS**
12       v.                        )
                                   )
13    ARTHUR CALDERON,             )
                                   )
14            Respondent.          )
                                   )
15    _____ )

16          Petitioner, a California prisoner proceeding pro se, filed the above-entitled petition for

17    a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The Court ordered respondent to show

18    cause why the petition should not be granted based on petitioner's nineteen cognizable

19    claims for relief.   Respondent filed an answer, exhibits and a memorandum in support

20    thereof.  Petitioner thereafter was granted leave to amend the petition to add an additional

21    cognizable claim for relief, for a total of twenty claims.  Pursuant to the Court's order,

22    respondent filed a supplemental answer with a supplemental supporting memorandum.

23    Petitioner has filed a traverse.

24                              **PROCEDURAL BACKGROUND**

25          Petitioner was charged in Alameda County Superior Court with two counts of forcible

26    rape, two counts of forcible sodomy, two counts of forcible oral copulation, and one count of

27    kidnaping.  Also included in the information were allegations of the use of a deadly weapon

28    as to all counts, kidnaping for the purpose of rape, sodomy, and oral copulation, and four

United States District Court
For the Northern District of California

prior "strike" convictions.  The prior convictions arose from three separate incidents: a 1986 rape and sodomy in Indiana, a 1973 rape in Illinois, and a 1968 attempted rape in Illinois.  At trial, petitioner moved to exclude evidence of these prior sex offenses, and after a hearing, the trial court denied the motion and admitted the evidence pursuant to California Evidence Code § 1108.  On August 26, 1998, the jury found petitioner guilty on all counts and the trial court found the allegations as to the prior convictions to be true.  Petitioner was sentenced to a state prison term of 29 years plus life without the possibility of parole.

On direct appeal, petitioner raised one of the claims presented herein, the unconstitutionality of the jury instructions as to evidence of his prior offenses.  The California Court of Appeal rejected the claim and affirmed the conviction.  The Supreme Court of California denied the petition for review, and the United States Supreme Court denied a petition for a writ of certiorari.  Petitioner raised his remaining claims in habeas petitions filed at all three levels of the California courts.  Those petitions likewise were denied.

**FACTUAL BACKGROUND**

At petitioner's jury trial, Jane Doe[1] testified to the following facts:  She was a student at the University of California at Berkeley in March 1991.  On the evening of March 3, 1991, she was walking home from campus, carrying a newspaper and take-out Chinese food.  While she was walking along Bowditch Street, petitioner, who was wearing a garbage bag as a poncho, passed by her, put his arm around her neck and put a knife to her throat.  He threatened to kill her if she screamed, and pushed her into a nearby trailer, where she dropped the newspaper and food.  She struggled with petitioner, broke off the tip of the knife and cut her hand.  Eventually, petitioner overpowered her, continued to threaten her with physical harm, told her he was going to rape her, and had her remove her clothes.  He handcuffed her, bound her feet, and then moved her into the kitchen area, where he raped her and forced her to have anal sex and to orally copulate him.  She did not consent to these acts, and was crying

---

[1]Throughout the state court proceedings, the complaining witness was referred to as "Jane Doe."

throughout the time they were occurring.  Petitioner then put a sock in her mouth and went into another room where he ate her food.  When he returned, he combed her pubic hair, directed her to defecate onto a newspaper (which she did), wiped her genitals and anus, and forced her to drink water.  He told her he was doing this so that no semen would be left behind.  He then moved her to the adjoining carpeted room and left for a period of time.  She tried to remove her bindings, but he returned before she could do so.  He told her she was going to pay for not keeping still, then moved her onto the carpeting, where he again raped her and forced her to have anal sex and to orally copulate him.  Petitioner talked to her throughout the sexual assault, asking her about her childhood, telling her to meditate, saying he understood her feelings, and telling her he would testify for her if she decided to sue the university, which owned the trailer.  Petitioner asked for her ATM card and PIN number, and she gave them to him.  He then removed her bindings, but told her to wait twenty minutes before leaving.  She got dressed, waited as instructed, and then walked to her home nearby.  Her roommate called the police, who arrived shortly thereafter.  She told the police what happened and accompanied them to the trailer, after which the police brought her to the hospital for a rape examination.

Jane Doe testified that she was in shock and did not remember everything that happened.  She further testified she had scratches on her neck from the knife, red lines on her wrists, and cuts on her hand.  She testified that after the assault, she lost interest in her classes and returned to the Midwest; she had been to San Francisco, but never for a social event and never knew anyone named Michael Hoffman; she had never been to the Ashkenaz Club in Berkeley, to any meditation seminar at San Francisco State University, or to any demonstration against the Gulf War.

Shelley Smith ("Smith"), Jane Doe's roommate, testified that on March 3, 1991, Jane Doe returned home at 11:00 p.m., about four hours later than expected.  Smith testified that Jane Doe appeared in obvious distress, that she had a knife wound on her neck near her jugular vein, very red eyes, and disheveled clothes and hair.  She described Jane Doe as incoherent and asking for help, crying, shaking and having trouble speaking.  Smith testified

3

1    that Jane Doe asked her to call the police, which she did, and that the police arrived within

2    five minutes.  Smith also testified that Jane Doe led a quiet social life, and that to her

3    knowledge Jane Doe never went to political rallies or war demonstrations, never attended any

4    events at San Francisco State University and never took a meditation seminar.  She also

5    testified she had never heard of a friend of Jane Doe named Michael Hoffman.

6         Berkeley Police Officer Terry Rein ("Officer Rein") testified that when she arrived at

7    Jane Doe's apartment, Jane Doe's eyes were red and she appeared very shaken.  Officer Rein

8    further testified that Jane Doe described the attack in the trailer, including that the three sex

9    acts had each happened twice, and that she described the assailant as a black man, about 35

10   years old, six feet tall and weighing approximately 190 pounds.  Officer Rein explained that

11   Jane Doe then accompanied her to the trailer, and thereafter to Alta Bates Hospital for a

12   "rape kit" examination, at which time Officer Tanya Cunningham ("Officer Cunningham")

13   of the campus police took over the investigation.

14        Officer Cunningham testified that when she saw Jane Doe at the hospital, she was

15   visibly upset, crying and flushed.  Officer Cunningham explained that she stayed with Jane

16   Doe throughout the rape examination, during which Jane Doe reported that her assailant had

17   told her he did not want to leave any evidence.  Officer Cunningham testified that she saw

18   marks around Jane Doe's neck and on her wrists.

19        Dr. Carter Clements ("Dr. Clements"), the physician who examined Jane Doe,

20   testified that she appeared "shell-shocked" and emotionally "shut down."  He testified that

21   she had "superficial lacerations about her neck," a mark under her chin consistent with the

22   use of a knife, and marks and bruises on her wrists consistent with the use of handcuffs.  (RT

23   at 1777).  It appeared to Dr. Clements that Jane Doe had been "forensically cleaned."  He

24   also noted that although she had no internal or external injuries to her genitals, her genitals

25   were tender; he found both motile and non-motile sperm during the examination.  In Dr.

26   Clements' opinion, the findings from his examination were consistent with Jane Doe's

27   account.

28        Officer Hansen Pang ("Officer Pang") of the campus police testified that on the night

1  of March 3, he searched two dumpsters near the trailer, where he found chopsticks, take-out

2  food containers, a newspaper with urine and human feces, and that in a nearby parking lot he

3  found a gray plastic garbage bag with arm holes in it.  Officer Pang testified that he found no

4  fingerprints.

5       Marcus Savage testified that on March 5, 1991, he was living in Berkeley and found a

6  pair of handcuffs lying in the gutter within a few blocks of the trailer.

7       San Francisco Police Officer Gordon Clark ("Officer Clark") gave the following

8  testimony about his arrest of petitioner in San Francisco on March 16, 1991:  At about

9  8:00 p.m., he received a report of a woman "being followed or stalked" by a man, and that he

10  also was given a description of the suspect.  Officer Clark and his partner arrived at the scene

11  within two minutes, at which time they observed petitioner, who fit the suspect's description.

12  Once he made eye contact with petitioner, petitioner immediately turned and began walking

13  away.  He asked petitioner to stop, which he did.  He noted that petitioner was sweating

14  profusely despite the cool temperature.  He found an unsheathed knife inside petitioner's

15  right sleeve, and arrested him for carrying a concealed weapon.  Petitioner said his name was

16  Jerry Lofton.  The parties later stipulated that Allan Citrin, the witness who called the police,

17  was brought by the police to the location of petitioner's arrest and identified petitioner as the

18  person he had seen following the woman.

19       San Francisco Police Inspector Joseph Pieralde ("Inspector Pieralde") testified that

20  while running petitioner's fingerprints, he learned that petitioner's real name was Fred Mott

21  and that there was an Indiana warrant outstanding for his arrest.  Inspector Pieralde further

22  testified that petitioner was extradited to Indiana on March 23, 1991, that the following day

23  he saw a news report about the assault of Jane Doe, and that the police eventually obtained

24  blood, hair and saliva samples from petitioner.

25       Robin Cotton, a forensic expert, testified that she performed DNA tests on the semen

26  samples taken from Jane Doe after the attack, as well as on Jane Doe's blood and petitioner's

27  blood, and that it was her opinion to a scientific certainty that the semen taken from Jane Doe

28  had come from petitioner.  Gary Harmor, another forensic expert, tested blood taken from

1   Jane Doe's sock, and concluded that it likewise had come from petitioner.

2       Jane Doe Chicago[2] gave the following testimony about the events leading to

3   petitioner's 1967 conviction for attempted rape:  On June 11, 1967, at approximately

4   12:30 a.m., as she was walking home in Chicago, Illinois, a man grabbed her from behind

5   and put a knife to her throat.  He told her not to scream and said, "I just want to get in your

6   pants."  When he began to pull her into an alley, she tried to grab the knife and was cut on

7   her hand.  Another man in the alley called out that he was a police officer and that he had a

8   gun.  She ran into a nearby parking lot and as she did so, she heard a gun shot behind her.

9   She turned around and saw a man on the ground.  The police officer told her she was safe and

10  that she could now approach.  She slowly approached, looked at the man on the ground, and

11  identified petitioner as the man who had attacked her.

12      Jane Doe Peoria gave the following testimony about the events leading to petitioner's

13  1973 conviction for rape:[3]  After midnight on August 19, 1973, as she was getting in her car

14  at a local carnival in Peoria, Illinois, a man put a knife to her throat, forced her into her car

15  and threatened to kill her if she screamed.  He directed her to drive to a deserted road, at

16  which point he forced her to take off her clothes and she refused to perform oral sex on him.

17  After hearing a dog bark, petitioner told her to drive to a cornfield.  She had put her clothes

18  back on, but petitioner told her to take them off again and forced her to perform oral sex on

19  him, after which he slapped her and told her to drive to another cornfield.  She thought she

20  was going to be killed, so she told petitioner she might be pregnant, and that she wanted to

21  live to protect her child.  Once they arrived at the second cornfield, petitioner raped her,

22  forced her to perform oral sex on him again, and forcibly sodomized her.  He then directed

23  her to drive him to a hospital, where he got out of the car and left.  Throughout the attack, he

24  asked her personal questions.  Once he had left, she reported the attack to the police.  She

25  

26          [2]At trial, the complaining witnesses in the cases giving rise to petitioner's prior convictions
27  were each referred to as "Jane Doe" followed by the name of the city where the crime occurred.

28          [3]Petitioner did not go to trial on the Peoria charges, but instead pled guilty to one count of
    rape.

1   identified petitioner from a photographic lineup and in court.  She further testified that the

2   police found some of petitioner's clothing in her car, including his jacket and shoes.

3       Jane Doe Elkhart gave the following testimony about the events leading to petitioner's

4   1986 conviction for rape and sodomy:  On the night of July 22, 1978, she had just gotten into

5   her car to leave a local fair in Elkhart, Indiana, when a man approached and asked her for a

6   ride.  When she refused, he put a knife to her throat through the open window and told her to

7   open the door.  After she complied, he pulled her out of the car, threw her to the ground, said

8   obscene things to her, and then ordered her to get back in the car and into the passenger seat,

9   which she did.  He drove her to another car, and told her to get in, threatening to cut her if

10  she did not comply with his orders.  He tied her hands behind her back, and drove to a

11  wooded area, where he parked the car.  He then forced her to drink vodka and to smoke

12  marijuana, after which he raped her.  He then drove her to a storage shed, for which he had a

13  key, took her inside, raped her again, forcibly sodomized her and orally copulated her.  He

14  then left her there, taking her clothes with him and locking the door.  When he returned, he

15  gave her back her clothes and drove her to her car.  He told her he wanted to have a

16  relationship with her, asked her personal questions, and seemed to want to tell her things

17  about himself.  She immediately drove home and told her parents what had happened.  They

18  called the police, and she later identified petitioner from photographs shown to her by the

19  police.

20      Petitioner gave the following testimony in his defense:  He arrived in California on

21  February 3, 1991, and obtained false identification because of his prior convictions.  He met

22  Jane Doe at an anti-war rally in San Francisco during his first week in the Bay Area; she was

23  with a friend named Michael Hoffman.  The three of them smoked marijuana and drank

24  alcohol together.  They then went to petitioner's hotel room, where he and Jane Doe had sex

25  while Hoffman slept.  She became upset because the condom broke, and left with Hoffman;

26  she gave petitioner her phone number so they both could get AIDS tests and swap results

27  over the phone.  A few days later, he ran into Hoffman in San Francisco, and learned that

28  Jane Doe would be at a meditation seminar at San Francisco State University.  He went there

with a co-worker, found Jane Doe, and they all had dinner together. Jane Doe told him that he could find her on campus at Berkeley. He ran into her again soon afterwards on campus, and they went to the Ashkenaz dance club in Berkeley together. On March 3, 1991, he was in Berkeley and noticed the trailer with the door open. Later that day, he ran into Hoffman, who was with a friend, on campus. The three of them walked to Bowditch Street, where they ran into Jane Doe, and the four of them went to the trailer together. Hoffman and his friend soon left. Petitioner told Jane Doe that if anyone was raped, assaulted or murdered in the trailer the university would be liable; he told her about a case where a student was suing the university because she had been raped on university property. Jane Doe asked him how much a lawsuit would cost and how long it would take, for a paper she was writing. They then had consensual sex, including vaginal intercourse and oral sex. He did not have any weapons, use any force, tie or handcuff her, or cut her. He felt she was setting up a "prop or stage for a lawsuit," and that if he provided her with his semen for her lawsuit, she would not implicate him. They then ate some food and had anal, oral and vaginal sex. They cleaned up the trailer. He never combed her pubic hair or had her defecate on a newspaper. They both left the trailer about 8:00 p.m. and she followed him to Telegraph Avenue. She gave him her ATM card and PIN number, instructed him to take money out of her account, and gave him $100. He told her that he knew she was trying to create the appearance that he had raped her.

During his testimony, petitioner admitted to having been convicted in Indiana and Illinois of rape, attempted rape, and sodomy. He denied engaging in any of the criminal conduct charged in the instant case. On cross-examination, he testified that he did not dispute the DNA evidence because he and Jane Doe had sex, but that her injuries were self-inflicted to make it appear as if she had been raped. When questioned about the facts of the Peoria and Elkhart cases, however, he refused to answer, invoking the Fifth Amendment.

///
///
///
///

**DISCUSSION**

A.      Standard of Review

        This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

        A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Habeas relief is warranted only if the constitutional error at issue had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  Penry v. Johnson, 532 U.S. 782, 796 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).  A federal court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1).

B.      Legal Claims

        1.      Jury Instruction Regarding Custodial Status

        Petitioner first claims that the trial court violated his right to due process by informing the jury, over his objection, that he was in custody.  At the beginning of the trial, the trial court gave the following instruction:

> Ladies and gentleman, I want to bring to your attention the fact that Mr. Mott is, in fact, in custody.  I bring that to your attention because the way the jury files in and out of the courtroom is also the access to the courtroom from other areas.  You are not to speculate as to why Mr. Mott is in custody.  You are not to draw any inferences from the fact that he is in custody.  You are not to allow the fact that he is in custody to enter into your deliberations in any way.

(Reporter's Transcript (Resp. Ex. A) ("RT") at 1082).

        As discussed above, habeas relief is only available on the basis of a violation of

9

federal law, as set forth by the United States Supreme Court.  28 U.S.C. § 2254(d)(1); see Williams (Terry) v. Taylor, 529 U.S. at 412 ("Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence.").  In support of his claim, petitioner cites Estelle v. Williams, 425 U.S. 501 (1976), and Holbrook v. Flynn, 475 U.S. 560 (1986).  Neither of those decisions holds that due process is violated by a trial court's informing the jury of the defendant's custodial status, however.  In Estelle, the Supreme Court held that requiring a defendant to wear prison clothing throughout a trial may violate his due process rights.  See Estelle, 425 U.S. at 504-05; Felts v. Estelle, 875 F.2d 785, 786 (9th Cir. 1989).  In Holbrook, the Supreme Court recognized that in certain cases the deployment of excessive numbers of security personnel in a courtroom could constitute a due process violation.  Holbrook, 475 U.S. at 569.  Here, unlike the prison garb and excessive security at issue in Estelle and Holbrook, which the Supreme Court noted were, respectively, a "constant reminder" of the defendant's custodial status, Estelle, 425 U.S. at 504, and signaled that the defendant was "dangerous and untrustworthy," Holbrook, 475 U.S. at 569, there was a single, brief reference to petitioner's custodial status, which was accompanied by a specific admonition against drawing any inference adverse to the defendant.  Although petitioner argues that Estelle and Holbrook should be read as providing a criminal defendant the right to have the jury remain entirely ignorant of his custodial status, neither case makes any statement to that effect, let alone "clearly establishes" such a right within the meaning of AEDPA.

Moreover, as noted, the trial court specifically directed the jury not to draw any inference from petitioner's custodial status, or to consider such status during the deliberations.  There is an "almost invariable assumption of the law that jurors follow their instructions," Richardson v. Marsh, 481 U.S. 2000, 206 (1987), and there is nothing in the record herein suggesting the jurors did otherwise.

Accordingly, the trial court's informing the jury of petitioner's custodial status does not provide grounds for habeas relief.

1          2.       Fifth Amendment Privilege

2          Petitioner asserts three claims relating to his Fifth Amendment privilege.[4]  First, he

3   claims the trial court incorrectly ruled he had no Fifth Amendment privilege to remain silent

4   when cross-examined about his prior offenses.  Second, he claims the trial court's instruction,

5   pursuant to CALJIC No. 2.62, after petitioner refused to answer the prosecutor's questions,

6   violated his rights under the Fifth Amendment.  Third, he claims his defense attorney was

7   ineffective in failing to secure his right to remain silent, in failing to inform him of his rights

8   in that regard, and in requesting the jury be instructed pursuant to CALJIC 2.62.

9          a.       Background

10          After defense counsel's pretrial motion to exclude evidence regarding petitioner's four

11   prior convictions for sex offenses failed, the circumstances of those offenses were described

12   by the victims during the prosecution's case-in-chief.  Prior to petitioner's direct testimony,

13   defense counsel argued that petitioner had a Fifth Amendment privilege to avoid answering

14   questions on cross-examination about his prior convictions.  (RT 2455-56).  The trial court

15   rejected this argument.  (RT 2458-59).  Defense counsel then requested that, if petitioner did

16   in fact refuse to answer any such questions on Fifth Amendment grounds, the trial court, in

17   lieu of striking petitioner's direct testimony, instruct the jury pursuant to CALJIC 2.62 that it

18   could draw adverse inferences from petitioner's refusal.  (RT 2458).  The trial court agreed to

19   do so.  (RT 2459).  Later, during a break in petitioner's direct testimony, defense counsel

20   informed the trial court that petitioner intended, during direct examination, to testify to the

21   fact of his four prior convictions, but would refuse, on Fifth Amendment grounds, to answer

22   any questions on cross-examination about the events giving rise to those convictions.  (RT

23   2551-52).  Toward the close of his direct testimony, petitioner then testified to the fact that he

24   had sustained four prior convictions.  (RT 2603-04).  Prior to cross-examination, defense

25   counsel again informed the trial court that petitioner's position had not changed regarding his

26   intention not to answer questions about his prior convictions.  (RT 2624).  The trial court

27

28          [4]These claims are alleged as the second, third, and fourth claims in the petition.

11

1   indicated that its ruling as to an absence of privilege had not changed, that petitioner would

2   be directed to answer such questions, and that if he refused, the jury would be instructed

3   pursuant to CALJIC 2.62.  (RT 2624-27).

4       On cross-examination, the prosecutor posed questions to petitioner about the facts and

5   circumstances underlying petitioner's Elkhart and Peoria convictions.  (RT at 2637-43).

6   Petitioner refused to answer, invoking his Fifth Amendment privilege, and the trial court

7   proceeded to instruct the jury pursuant to CALJIC 2.62.  (RT at 2637, 2640-41, 2643).

8           b.    Claims

9       Petitioner claims he had a Fifth Amendment privilege not to answer questions on

10  cross-examination about his Elkhart and Peoria convictions.  Petitioner, however, waived any

11  such privilege when he testified.  A defendant who testifies on his own behalf waives his

12  Fifth Amendment privilege against self-incrimination at least to the extent of the scope of

13  relevant cross-examination.  Johnson v. United States, 318 U.S. 189, 195 (1943); Caminetti

14  v. United States, 242 U.S. 470, 494 (1917).  The circumstances giving rise to petitioner's

15  prior convictions fell within the scope of  relevant cross-examination in at least two ways.

16  First, the facts of those prior offenses were relevant as to the issue of petitioner's credibility.

17  By testifying, petitioner placed his credibility at issue; by further testifying that Jane Doe had

18  consented to having sex with him, petitioner made his credibility a central issue in the case.

19  Second, under state law, specifically, California Evidence Code § 1108, petitioner's prior sex

20  offenses were relevant to prove he had a propensity to commit rape and other sex offenses,

21  and that he acted in conformity with such character trait in committing the charged offenses.

22  Nothing in § 1108 restricts, and petitioner points to no law so restricting, the evidence

23  admissible under that section to the mere fact of the prior conviction, as opposed to the facts

24  and circumstances of the prior offenses.

25      Moreover, to qualify for Fifth Amendment protection, the defendant's compelled

26  testimony must be incriminating.  See Hiibel v. Sixth Judicial District Court of Nevada,

27  Humboldt County, 542 U.S. 177, 189 (2004).  The testimony is incriminating if "the threat of

28  future criminal prosecution is reasonably particular and apparent."  See also United States v.

Antelope, 395 F.3d 1128, 1134 (9th Cir. 2005). Here, during cross-examination, the prosecutor asked petitioner if he acknowledged the truth of the facts of two of the prior sex crimes. Such acknowledgment would not have been incriminating because petitioner already had been convicted of those offenses. Petitioner identifies no additional or future charges that could have been brought by reason of his answering the prosecutor's questions and either acknowledging or denying the truth of the evidence of the prior offenses. Consequently, there was no "reasonably particular and apparent" threat of future criminal prosecution, and accordingly, the trial court correctly found petitioner had no Fifth Amendment privilege.

The trial court's instructing the jury, pursuant to CALJIC No. 2.62, that it could draw adverse inferences from petitioner's refusal to answer the prosecutor's questions likewise did not violate petitioner's Fifth Amendment rights. An accused who takes the stand "may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence, in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences to be naturally drawn from it." Caminetti v. United States, 242 U.S. 470, 494 (1917) (approving use of jury instruction that allowed jury to consider testifying defendant's failure to deny or explain acts of an incriminating nature introduced in prosecution's case). Id. at 493.

Further, defense counsel was not deficient in his efforts to secure petitioner's Fifth Amendment privilege, or in failing to object to the trial court's use of CALJIC No. 2.62. As discussed above, in order to prevail on a Sixth Amendment claim of ineffective assistance, a petitioner must establish that his attorney's performance fell below an "objective standard of reasonableness" under prevailing professional norms, and, further, that he was prejudiced by such deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland, 466 U.S. at 694. Here, petitioner's counsel, at significant stages of the proceedings, made the argument that petitioner had a Fifth Amendment privilege with respect to the prior offenses. Prior to petitioner's taking the witness stand, counsel argued that petitioner's testifying would not waive the privilege (RT at 2457). The trial court rejected

13

that argument.  (RT 2459).  When counsel raised the point again prior to cross-examination of petitioner, the trial court again found there was no privilege  (RT 2624).[5]  Petitioner does not identify any additional arguments counsel could have made that would have established petitioner had a Fifth Amendment privilege to avoid answering the prosecutor's questions about his prior offenses.  Indeed, as explained above, petitioner had no such privilege.  Consequently, counsel's failure to obtain a ruling to the contrary did not amount to deficient performance.  Similarly, counsel was not deficient in failing to object to the court's instructing the jury under CALJIC 2.62, as any such objection would have been to no avail.  See, e.g., Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) (holding trial counsel cannot be found ineffective for failing to raise meritless motion).

Nor was counsel deficient in requesting that the court give CALJIC No. 2.62.  Petitioner claims counsel should not have requested this instruction because it violated petitioner's Fifth Amendment rights.  As discussed, this instruction did not violate petitioner's Fifth Amendment rights.  Moreover, counsel requested the instruction to avoid the trial court's imposing what it termed the "ultimate sanction," specifically, striking petitioner's entire direct testimony.  (RT at 2458, 2624).  By requesting the instruction, counsel ensured that petitioner could present his consent defense to the jury in his own testimony.

Lastly, the record refutes petitioner's assertion that counsel was ineffective in failing to advise him that he could not invoke his Fifth Amendment privilege when cross-examined about the prior offenses.  Petitioner states he would not have testified had he known he did not have such a privilege.  As noted, however, the record indicates the trial court, in petitioner's presence, clearly rejected his claim of privilege well before he testified.  (RT at 2458, 2459).  By that ruling, the trial court advised petitioner he would have no privilege to avoid answering the prosecution's questions about his prior offenses.  Consequently, counsel was not deficient in not additionally advising petitioner to such effect, and there is no

_____

[5]Prior to cross-examination, petitioner's counsel did succeed in limiting the scope of cross-examination to two of the three prior offenses.  (RT 2611-22).

14

1    reasonable probability that counsel's doing so would have made a difference as to

2    petitioner's decision to testify or, ultimately, to the outcome of the case.

3        In sum, for the reasons set forth above, petitioner did not have a Fifth Amendment

4    privilege to avoid cross-examination about his prior offenses and his trial counsel's conduct

5    of the defense with respect to that issue did not violate petitioner's Sixth Amendment right to

6    effective assistance of counsel.

7        3.   Prosecutorial Misconduct

8        Petitioner claims the prosecutor committed misconduct by asking him questions that

9    misrepresented the defense he presented at his trial on the Indiana charges.  Petitioner also

10   claims his attorney was ineffective in failing to object to the prosecutor's questions.[6]

11       a.   Background

12       On direct examination, petitioner testified that Jane Doe consented to sex, and, as

13   noted, he admitted to having been convicted previously of four sex offenses.  (RT 2603-04).

14   Before cross-examination, defense counsel argued that questions as to the facts and

15   circumstances of the prior offenses should not be allowed.  (RT 2611-16).  The trial court

16   allowed cross-examination about the similarities between petitioner's consent defense in the

17   Elkhart case and his consent defense to the instant charges.  (RT 2621-22).  At the Indiana

18   trial, petitioner testified that he first met Jane Doe Elkhart and spoke with her briefly during

19   the week of July 4, 1978, when she was a customer at the "Arby's" restaurant where

20   petitioner worked.  See Pet. App. C (excerpts from reporter's transcript in Indiana trial).[7]  He

21   further testified that on July 14, 1978, they met for dinner and then went back to his house,

22   where they had consensual sex.  Id.  He testified that they later arranged to meet on July 22,

23   1978 at the local fair, which they did, and that later that evening they again had consensual

24   sex.  Id.

25

26   _____

27       [6]These claims are alleged as the fifth and sixth claims in the petition.

28       [7]Although petitioner provides page citations in the petition, the page numbers are missing
from the copy of the Elkhart transcript provided to the Court.

1                    b.      Claims

2          Petitioner claims that the prosecutor misrepresented the consent defense he presented

3  in the Elkhart case in order to make petitioner's defense in that case appear more similar to

4  his defense to the instant charges.  A defendant's due process rights are violated when a

5  prosecutor's misconduct renders a trial "fundamentally unfair."  See Darden v. Wainwright,

6  477 U.S. 168, 181 (1986).  Under Darden, the first issue is whether the prosecutor's conduct

7  was improper; if so, the next question is whether such conduct infected the trial with

8  unfairness.  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).  The latter determination is

9  made by "examining the entire proceedings to determine whether the prosecutor's remarks so

10 infected the trial with unfairness as to make the resulting conviction a denial of due process."

11 Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).   Improper questioning and misstating

12 the evidence are two types of misconduct that violate a defendant's right to due process if

13 they have infected the trial with unfairness.  See, e.g. Darden, 477 U.S. at 182; Ortiz v.

14 Stewart, 149 F.3d 923, 934 (9th Cir. 1998).

15         Petitioner argues that questions by the prosecutor on cross-examination

16 misrepresented his Elkhart trial testimony in four different respects.[8]  First, petitioner asserts

17 that the prosecutor "compressed everything that occurred between the initial meeting

18 [between petitioner and the Jane Doe Elkhart] and the sexual activity over a week later into a

19 time frame of an hour and 15 minutes."  See Pet. at 70.  Second, he contends that the

20 prosecutor suggested that petitioner had testified that Jane Doe Elkhart became upset during

21 the sexual activity, whereas petitioner had testified she was upset because they were unable

22 to have sex in the car.  Third, he claims that the prosecutor implied he had testified that Jane

23 Doe Elkhart vomited from orally copulating him, whereas he actually testified she vomited

24 because of food she had eaten.  Lastly, petitioner claims that the prosecutor implied he had

25 testified that his encounter with Jane Doe Elkhart was unplanned, whereas he testified they

26

27         [8]Although petitioner could have corrected such asserted misrepresentations in his responses to
   the prosecutor's questions, he declined to do so.  Instead, as described above, petitioner refused to
28 answer these questions on Fifth Amendment grounds.

1    had arranged to meet in advance.

2          At the outset, the Court notes that the prosecutor's questions do not characterize

3    petitioner's Elkhart trial testimony in the manner petitioner describes.  See RT 2642-43,

4    2667-68, 2715-16.  At most, the prosecutor's questions were ambiguous, and there is no

5    indication that the jury interpreted them to suggest any of the inaccuracies petitioner cites.

6    Nevertheless, even if the jury had interpreted the prosecutor's questions as petitioner claims,

7    petitioner's trial was not thereby rendered fundamentally unfair.  The trial court found

8    petitioner's testimony at the Elkhart trial relevant to the credibility of petitioner's defense in

9    the instant case, because petitioner, when facing similar charges of rape and forcible sodomy

10   in the past, had asserted as a defense that the alleged victim had consented to sex.  The

11   foregoing alleged inaccuracies in the prosecutor's questions went to minor details of that

12   prior defense. Consequently, any misrepresentation as to such matters lacked the significance

13   necessary to have rendered the trial as a whole fundamentally unfair, such as to violate

14   petitioner's right to due process.

15         For the same reason, petitioner was not prejudiced by defense counsel's failure to

16   object to the prosecutor's questions.  In order to establish ineffective assistance of counsel, a

17   petitioner must show his attorney's performance was deficient, and that such deficient

18   performance resulted in prejudice to the petitioner.  Strickland v. Washington, 466 U.S. 668,

19   686-88, 694 (1984).  To establish prejudice, a petitioner must show "there is a reasonable

20   probability that, but for counsel's unprofessional errors, the result of the proceeding would

21   have been different."  Id. at 694.  Here, even if objections to the prosecutor's questions would

22   have been sustained, those questions, as noted, concerned relatively insignificant details in

23   petitioner's prior testimony, and thus no reasonable probability exists that the outcome of the

24   trial would have been different.  Consequently, even if the prosecutor's questions could be

25   characterized as misconduct, petitioner's claim of ineffective assistance of counsel fails for

26   want of prejudice.[9]

27   _____

28         [9]A court need not determine whether counsel's performance was deficient before examining the
     prejudice suffered by the defendant as a result of the alleged deficiencies.  See Strickland, 466 U.S. at 697.

1

     4.     <u>Jury Instructions Regarding Prior Offenses</u>

2

     Petitioner claims the jury instructions regarding the use of evidence of petitioner's

3 prior sexual offenses violated his right to due process by lowering the prosecution's burden

4 of proving guilt beyond a reasonable doubt.[10]  The trial court instructed the jury as follows,

5 incorporating modified versions of CALJIC No. 2.50.1 and the version of CALJIC No.

6 2.50.01 in existence at that time:[11]

7
8
> Evidence has been introduced for the purpose of showing that the defendant committed sexual offenses other than those charged against the defendant in this case.
>
9      If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit sexual offenses.
>
10      If you find that the defendant had this disposition, you may, also, but are
11 not required to, infer that he was likely to commit and did commit the crimes charged against him.
>
12      However, evidence that the defendant committed prior sexual offenses is not sufficient by itself to prove that he committed the charged offenses.  The weight and significance of the evidence, if any, are for you to decide.
13      Within the meaning of the preceding instruction, the prosecution has the burden of proving by a preponderance of the evidence that a defendant
14 committed sexual offenses other than those for which he is on trial.
>
15      You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that defendant committed the other sexual offenses.
16      "Preponderance of the evidence" means evidence that has more convincing force than that opposed to it.
17      You should consider all of the evidence bearing upon every issue regardless of who produced it.
18

19 (Clerk's Transcript (Resp. Ex. B) ("CT") at 1291-93).  Petitioner argues that this instruction

20 lowered the prosecution's burden of proof because it allowed the jury to find guilt based

21 solely on evidence of the prior sexual offenses, which only had to be proved by a propensity

22 of the evidence.

23      The Due Process Clause of the Fourteenth Amendment protects the accused against

24 conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute

25 the crime with which he is charged.  <u>See</u> <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  When

26 evaluating whether a jury instruction violated a defendant's due process rights, "[i]t is well

27        [10]This claim is alleged as the seventh claim in the petition.

28        [11]CALJIC No. 2.50.01 was modified in 1999.

1   established that the instruction may not be judged in artificial isolation, but must be

2   considered in the context of the instructions as a whole and the trial record." Estelle v.

3   McGuire, 502 U.S. 62, 72 (1991) (internal quotation and citation omitted).  Rather, a

4   petitioner must show there was a reasonable likelihood that in light of the instructions and the

5   record as a whole, the jury applied the challenged instruction in such a way that his

6   constitutional rights were violated.  See Carriger v. Lewis, 971 F.2d 329, 334 (9th Cir.1992)

7   (en banc).

8        The California Court of Appeal, citing Estelle, 502 U.S. 62, 70-75 (1991), found, in

9   light of the record and the instructions as a whole, there existed no reasonable likelihood that

10   the jury interpreted the challenged instruction as allowing a lowered standard of proof as to

11   the offenses charged.  Slip Op. at 15-16.[12]

12        The California Court of Appeal's ruling was reasonable.  Although the foregoing

13   instruction provides that the prior offenses may be proved by a preponderance of the

14   evidence, the instruction does not say anything about the prosecution's burden of proof as to

15   the charged offenses.  In addition, the instruction advised the jury that evidence of prior

16   sexual offenses "is not sufficient by itself to prove" the defendant committed the charged

17   offenses.[13]

18        Other instructions further made clear the proper standard of proof as to the charged

19   offenses.  First, the jury was instructed to consider all of the instructions as a whole and "not

20   to single out any particular sentence or any individual point or instruction."  (RT at 2861).

21   Additionally, the jury was instructed, pursuant to CALJIC No. 2.90, that the prosecution had

22   "the burden of proving [petitioner] guilty beyond a reasonable doubt" (RT at 2874), and

23

24        [12]The California Court of Appeal also rejected this claim on the alternative ground that even if
25   the instruction was erroneous, such error was harmless.  Id. at 16-18.

26        [13]The trial court added the following language to the version of CALJIC 2.50.1 in effect at the
   time of trial: "[E]vidence that the defendant committed prior sexual offenses is not sufficient by itself
27   to prove that he committed the charged offenses.  The weight and significance of the evidence, if any,
   are for you to decide."  The California Court of Appeal found "this language essentially tracks the
28   1999 revision of CALJIC No. 2.50.01," a revision found constitutional by the California Supreme
   Court.  Slip Op. at 14.

1   pursuant to CALJIC No. 2.01 that

2       each fact which is essential to complete a set of circumstances necessary to
3       establish the defendant's guilt must be proved beyond a reasonable doubt. In
        other words, before an inference essential to establish guilt may be found to
        have been proved beyond a reasonable doubt, each fact or circumstance upon
4       which such inference necessarily rests must be proved beyond a reasonable
        doubt.

5   (RT at 2864). Thus, the jury was repeatedly instructed by the trial court that the

6   prosecution's burden was to prove every element of the offense beyond a reasonable doubt.

7       Petitioner cites to Gibson v. Ortiz, 387 F.3d 812 (9th Cir. 2004), in which the Ninth

8   Circuit found the pre-1999 version of CALJIC 2.50.01, when used in conjunction with

9   CALJIC 2.50.1, unconstitutionally lowers the prosecution's burden of proof. See id. at 822.

10  In Gibson, the pattern instructions were not modified, and read, in pertinent part:

11      If you find that the defendant committed a prior sexual offense, you may, but
12      are not required to, infer that the defendant had a disposition to commit the
        same or similar type sexual offenses. If you find that the defendant had this
13      disposition, you may, but are not required to, infer that he was likely to commit
        and did commit the crime or crimes of which he is accused.

14      Within the meaning of the preceding instructions the prosecution has the
15      burden of proving by a preponderance of the evidence that a defendant
        committed sexual offenses and/or domestic violence other than those for which
16      he is on trial.

17  Id. at 817-18.

18      The instant case is distinguishable from Gibson. By reason of the trial court's

19  modification, the standard instructions given in the instant case differed substantially and

20  materially from the instructions found unconstitutional in Gibson. In Gibson, the Ninth

21  Circuit found the instructions therein permitted the jurors to convict based solely on a finding

22  that the defendant committed the prior offenses, and then advised them such offenses could

23  be proved by a preponderance of the evidence. In so holding, the Ninth Circuit noted it was

24  the "interplay" of the instructions there at issue that allowed the jury to convict based on a

25  preponderance of the evidence. See id. At 822. Here, by contrast, the trial court modified

26  the pattern instruction to address the precise infirmity identified by the Ninth Circuit. As

27  explained above, the trial court in this case instructed the jury that "evidence that the

28

20

1  defendant committed prior sexual offenses <u>is not sufficient by itself</u> to prove that he

2  committed the charged offenses." <u>See</u> CT at 1292 (emphasis added).

3        A second distinction between the instant case and <u>Gibson</u> is that in <u>Gibson</u> the Ninth

4  Circuit described the prosecutor's argument as stating, in effect, that "CALJIC No. 2.50.01

5  created an exception to the general rule for . . . evidence [of prior sexual offenses] that

6  allowed the jury to find only by a preponderance of the evidence that Gibson was indeed

7  'that kind of a guy' and that he 'did in fact commit these crimes.'" <u>Id.</u> at 824.  Although, as

8  the Ninth Circuit noted, such arguments are given considerably less weight than the

9  instructions of the trial judge, they nevertheless are considered "as part of the context" for

10  purposes of evaluating the likely effect of the challenged instruction.  <u>See id.</u> at 824

11  (considering prosecutor's arguments in determining whether CALJIC Nos. 2.50.01 and

12  2.50.1 lowered standard of proof) (citations omitted).  Here, by contrast, the prosecutor made

13  no such argument. (RT 2798-801).  Further, defense counsel, in his closing argument,

14  characterized the question before the jury as "whether or not this is a present offense, and if

15  this offense has been proven beyond a reasonable doubt." (RT at 2827).

16        For the above reasons, the instructions given did not unconstitutionally lower the

17  prosecution's burden of proof, and the California Court of Appeal was reasonable in

18  concluding no reasonable likelihood exists that a juror would interpret the challenged

19  instruction as doing so.

20        5.   <u>Evidence Regarding Petitioner's Presence in Berkeley and Arrest</u>

21        Petitioner's next claims are based on the prosecution's presentation of evidence

22  regarding events in Berkeley on a date other than that of the charged offense and evidence of

23  the circumstances of his arrest in San Francisco.  Petitioner claims this evidence was more

24  prejudicial than probative, thus rendering the trial fundamentally unfair in violation of his

25  right to due process; he further claims his counsel provided ineffective assistance in failing to

26  prevent the introduction of the evidence of his arrest.[14]

27

28        [14]These claims are alleged as the eighth and ninth claims in the petition.

A state court's admission of evidence infringes a defendant's constitutional right to due process if, as a result, the defendant received a fundamentally unfair trial. See Pulley v. Harris, 465 U.S. 37, 41 (1984). On federal habeas review, the due process inquiry is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995). Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

At trial, petitioner offered to stipulate to the date and fact of his arrest, as well as to his presence in Berkeley on the date of the charged offense, but the prosecution did not agree to the stipulation and instead sought to present evidence on those issues. The trial court did not accept the stipulations, and allowed the prosecution to present its evidence. In particular, the prosecution was permitted to present testimony that on March 16, 1991, petitioner was arrested when he was found in San Francisco in the vicinity of where a man reportedly was seen "following or stalking" a woman, that petitioner fit the description of the suspect, and that at the time of his arrest petitioner had a knife tucked into the sleeve of his jacket. (RT 1820-37, 1843). The trial court instructed the jury not to consider the evidence of the report for its truth, namely, that petitioner was in fact stalking a woman, but rather only for the purpose of evaluating the officer's testimony as to his reason for stopping petitioner. (RT 1823-24). To prove petitioner's presence in Berkeley, the prosecution presented the testimony of Brandi Pallas ("Pallas"), a woman who had lost her car keys at an A.T.M. in Berkeley five days before the charged offense, and the testimony of police officers who found the keys, along with a notation of Pallas's license plate number, in a search of petitioner's residence. (RT 1863-64, 2184-86).

The jury was entitled to draw permissible inferences from the foregoing evidence. The evidence concerning the circumstances surrounding petitioner's arrest was relevant to explain how the police came to find a knife on petitioner's person. The evidence that the officers found a knife in petitioner's possession was relevant to demonstrate, consistent with Jane Doe's testimony, that petitioner not only possessed a knife but that he carried it on his

person.  Similarly, the jury was entitled to draw a reasonable inference from the evidence regarding the recovery of Pallas's keys, specifically, that petitioner was in Berkeley at the time of the charged offense.  Petitioner argues such evidence was not probative because he did not dispute he was in Berkeley on March 3, 1991 or the facts and circumstances surrounding his arrest.  The fact that petitioner did not dispute either his presence in Berkeley at the time of the charged offense or his subsequent arrest, however, did not preclude the trial court from admitting the prosecution's evidence on those issues.  "[N]othing in the Due Process Clause of the Fourteenth Amendment requires the state to refrain from introducing relevant evidence simply because the defense chooses not to contest the point."  Estelle v. McGuire, 502 U.S. 62, 70 (1991).

Petitioner asserts the evidence concerning the circumstances surrounding petitioner's possession of a knife and his presence in Berkeley was prejudicial because it suggested he was stalking other women.  With respect to the former, the trial court effectively dealt with the risk of the jury's drawing such an inference, by giving the above-described limiting instruction.  (RT 1823-24).  The jury is presumed to have followed this instruction.  See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1982).  With respect to the latter, the testimony focused on petitioner's having found Pallas's keys.  There was no evidence that petitioner had followed or stalked Pallas, or that she ever felt anyone had done so.

In sum, there were permissible inferences for the jury to draw from the relevant evidence of petitioner's arrest and presence in Berkeley, any prejudicial effect of such evidence was relatively minor and, with respect to the arrest, minimized by the trial court's instructions.  Consequently, the admission of such evidence did not render the trial fundamentally unfair so as to violate due process.

As noted, petitioner further claims his counsel was ineffective in failing to prevent the admission of evidence concerning the circumstances of his arrest.[15]  Petitioner's counsel did object to this evidence, however, arguing that it was both irrelevant and more prejudicial than

---

[15]Petitioner does not claim his counsel was ineffective in not precluding the admission of the evidence concerning Pallas.

probative.  Although, as petitioner notes, his counsel did not specifically object to the arresting officer's testimony that reported stalkers often have prior police contacts,[16] any risk of prejudice from such evidence was averted, as discussed above, by the court's limiting instruction to the jury.  Consequently, even if counsel was deficient in not raising such objection, petitioner cannot demonstrate he was prejudiced thereby.  See Strickland v. Washington, 466 U.S. at 694.

> 6.    Use of "Jane Doe"

Pursuant to California Penal Code § 293.5, the trial court allowed the complaining witnesses in both the charged offense and petitioner's prior offenses to be referred to as "Jane Doe."  See Cal. Pen. C. § 293.5 (authorizing use of "Jane Doe" if it "is reasonably necessary to protect the privacy of the person and will not unduly prejudice the prosecution or the defense").  The trial court instructed the jury that such aliases were being used solely to protect the witnesses' privacy, and that the jury was not to draw any inference therefrom as to petitioner's guilt or the truth of the allegations against him.  (RT 2211).  Petitioner claims the use of "Jane Doe" instead of the witnesses' actual names violated his right to due process[17] because it suggested to the jury that the witnesses were the victims of sexual offenses.  Petitioner further claims his counsel provided ineffective assistance in connection with the use of "Jane Doe."[18]

The Court is aware of no Supreme Court precedent or any other federal law, and petitioner cites none, providing that the federal right to due process is implicated by the use of a "Jane Doe" alias for the victim and other prosecution witnesses.[19]  As explained above,

---

[16]This evidence was offered to explain why the officer questioned petitioner's statement that his name was "Jerry Lofton" and how he came to determine petitioner's true name.

[17]Petitioner also argues that the trial court's order violated state law.  Violations of state law are not a cognizable basis for federal habeas relief.

[18]These claims are alleged as the tenth and eleventh claims in the petition.

[19]The Ninth Circuit has held "there is no absolute right of an accused to have a jury hear a witness's true name."  See Clark v. Ricketts, 958 F.2d 851, 855 (9th Cir. 1991) (finding no violation of Confrontation Clause by concealment of witness's name and address for purposes of protecting witness's physical safety).

1   habeas relief is only available on the basis of a violation of federal law, as set forth by the

2   United States Supreme Court.  28 U.S.C. § 2254(d)(1); see Williams v. Taylor, 529 U.S. at

3   412 ("Section 2254(d)(1) restricts the source of clearly established law to [the Supreme]

4   Court's jurisprudence.").

5          Petitioner claims his attorney was ineffective in challenging the trial court's order

6   allowing the use of "Jane Doe."  Defense counsel objected to any use of the name "Jane

7   Doe" on the ground such references would connote petitioner's guilt, and suggested the

8   witnesses be referred to by a different form of alias such as "Mrs. Smith, Mrs. Jones,

9   Mrs. Jackson, Mrs. Johnson."  (RT 587-92).  The trial court rejected counsel's argument.  Id.

10  Counsel's argument on this issue was not deficient, and petitioner does not suggest what

11  additional arguments could have been made.  Moreover, petitioner suffered no prejudice by

12  reason of the use of "Jane Doe."  As noted, petitioner contends the use of "Jane Doe"

13  suggested the witnesses were victims of sexual offenses.  The trial court expressly instructed

14  the jury, however, that the name "Jane Doe" was used solely to protect the witnesses'

15  privacy, not to identify them as crime victims.  The jury is presumed to have followed this

16  instruction.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000) (holding jury is presumed to

17  have followed limiting instruction).  Under these circumstances, there is no reasonable

18  probability that the outcome of the trial would have been different had the complaining

19  witnesses been identified in some other manner.

20         Petitioner further claims his attorney was ineffective in not moving for a mistrial

21  based on the possibility that the jury might have been lead to believe petitioner committed a

22  sex crime in Carbondale, Illinois.  Petitioner's argument is based on the trial court's inclusion

23  of a "Jane Doe" from Carbondale on the list of  potential witnesses and the admission of

24  evidence that petitioner had served part of his sentence on the 1968 conviction in a work-

25  release program in Carbondale.[20]  There was no comment as to, let alone any evidence of, a

26  sexual offense having been committed there, however.  (RT 2208).  Trial counsel is not

27  _____

28       [20]The evidence as to where petitioner served his sentence was part of the official record of the
    1968 conviction.

1   deficient by reason of failing to raise a meritless motion.  See Juan H., 408 F.3d at 1273.

2   Further, the jurors were instructed that they were to decide the case based solely on the

3   evidence.  (CT at 1271).  As noted, the jury is presumed to have followed this instruction.

4   Accordingly, defense counsel was not ineffective in failing to move for a mistrial, and in any

5   event, petitioner was not prejudiced by any failure to do so.

6           7.    Judicial Misconduct

7           Petitioner claims the trial judge engaged in misconduct by interacting with Jane Doe

8   while she was on the witness stand and that his attorney provided ineffective assistance in

9   connection therewith.[21]

10          On federal habeas review, a claim of judicial misconduct by a state judge turns on

11  whether the state judge's behavior "rendered the trial so fundamentally unfair as to violate

12  federal due process under the United States Constitution."  Duckett v. Godinez, 67 F.3d 734,

13  740 (9th Cir. 1995).  A state judge's conduct must be significantly adverse to a defendant

14  before it can be deemed to violate due process and warrant federal intervention.  See Garcia

15  v. Warden, 795 F.2d 5, 8 (2d Cir. 1986).  In determining whether the claimed misconduct

16  was of sufficient gravity to warrant the conclusion that fundamental fairness was denied, this

17  Court must consider such conduct in the context of the trial as a whole.  See Duckett, 67 F.3d

18  at 741 (citations omitted).

19          In a recess during the examination of Jane Doe, petitioner objected to the trial judge's

20  conduct and was allowed to place the following statement on the record:

21          [O]nce today and once yesterday I observed [the trial judge] and the
            complaining witness in personal conversation.  At the time of the observation
22          today, [the trial judge] was sitting at the bench and the witness was sitting in
            the witness chair.  Today they were conversing and engaging in what seemed to
23          be amiable conversation. [The trial judge] was smiling and even grinning.  The
            complaining witness was smiling and laughing.
24

25  (RT 1493).  Petitioner further stated that this "conversation continued while the jury was

26  coming back into the courtroom."  Id.  The trial judge then asked counsel for the respective

27  parties what they had observed.  The prosecutor stated she did not see or hear the

28          _____

            [21]These claims are alleged as the twelfth and thirteenth claims in the petition.

conversation described; defense counsel stated he could see that a conversation was taking place, but did not hear what was said. (RT 1494). Regarding the subject conversation, the trial judge stated:

> I inquired yesterday of the witness if she was all right and wished to continue. Today I also inquired of her if she was all right and wished to continue and if she felt like she needed additional water and if everything was okay so she could proceed. The jury was not present yesterday. As soon as the first juror came through the door I stopped my communication with that witness today. So your characterization of what happened, Sir, simply is not true, as is a lot of other things you have said are not true.

(RT 1494). The court reporter filed an affidavit stating that she heard the conversations between the judge and Jane Doe, that they were as the judge described, and that the jury was not present during those conversations. (CT 1219-20). Petitioner thereafter moved to poll the jury as to whether they had observed the conversations; he also moved for a mistrial. (RT 1619). Defense counsel did not join in these motions, which were denied.

This Court need not determine whether any members of the jury observed the interaction between the trial judge and Jane Doe because the trial judge gave the jury the following instruction pursuant to CALJIC 17.30:

> I have not intended by anything I have said or done, or by any questions I may have asked, or by any ruling I may have made, to intimate or suggest what you should find to be the facts, or that I believe or disbelieve any witness. If anything I have done or said has seemed to so indicate, you will disregard it and form your own conclusion.

(CT 1318). As discussed above, the jurors are presumed to have followed this instruction. Consequently, even if one or more of the jurors had observed the judge speaking to the witness, such jurors are presumed not to have inferred therefrom that the trial judge had formed any opinion as to her credibility or petitioner's guilt. Considered in the context of the trial as a whole, the interaction between the witness and trial judge did not render the trial fundamentally unfair so as to violate petitioner's right to due process.

Petitioner claims defense counsel was ineffective because he did not join in petitioner's motions to poll the jury and for a mistrial. "In order to establish prejudice under Strickland from the failure to file a motion, petitioner must show that 1) had counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious; and 2) had

the motion been granted, it is reasonable that there would have been an outcome more favorable to him." <u>Wilson v. Henry</u>, 185 F.3d 986, 990 (9th Cir. 1999).  As discussed, the jury is presumed to have followed the trial court's cautionary instruction not to consider any actions on the part of the trial judge as indicating the judge's opinion as to the merits of the case.  Petitioner does not identify any argument that would have persuaded the trial judge to grant the motions.  As noted, counsel is not required to make a meritless motion, <u>see</u> <u>Juan H.</u>, 408 F.3d at 1273, and, in any event, there is no reasonable probability that counsel's joining in petitioner's motions would have made a difference in the outcome of the trial.

       8.    <u>Additional Ineffective Assistance Claims</u>

Petitioner claims he received ineffective assistance by reason of various additional asserted deficiencies in counsel's performance and that the trial court violated his right to counsel by not replacing his trial counsel with another attorney.[22]

Petitioner claims defense counsel did not effectively challenge Jane Doe Peoria's credibility on cross-examination in that he did not confront her with prior inconsistent statements about the sexual assault.  Specifically, petitioner contends the Peoria court records do not indicate Jane Doe Peoria told petitioner she was pregnant or that he anally penetrated her not only with his finger but also his penis, or that she had identified him at a live lineup as well as at the photographic lineup.  Petitioner also claims defense counsel was ineffective in deciding not to cross-examine Jane Doe Elkhart.  Finally, petitioner contends defense counsel should have requested a jury instruction that "deviate sexual conduct" does not, under Illinois law, include sodomy.[23]  Petitioner argues such an instruction would have clarified that his guilty plea did not necessarily encompass an admission to sodomy.

In connection with petitioner's request for substitution of counsel, defense counsel explained his reasoning with respect to cross-examination of Jane Doe Peoria and Jane Doe

---

[22]These claims are alleged as the fourteenth and fifteenth claims in the petition.

[23]During cross-examination, the prosecutor read to petitioner a factual basis admitted by him in connection with his guilty plea in the Peoria case.  Included therein was the statement that petitioner had "assaulted [Jane Doe Peoria], sexually assaulted her and attempted to commit sexual intercourse with her and deviate sexual conduct and, in fact, did." (RT 2639).

Elkhart.[24]  Defense counsel stated he had reviewed the records of the prior convictions, but decided for tactical reasons not to cross-examine the witnesses in the manner petitioner suggests.  Defense counsel was of the opinion that the asserted inconsistencies would be too trivial to benefit petitioner and that, given the witness's emotional state, cross-examination thereon would be detrimental to petitioner's case; he also felt Jane Doe Elkhart's emotional state was such that requiring her to go through her testimony again would work to petitioner's detriment in the eyes of the jury.   Given such indicia of tactical reflection by counsel, judicial scrutiny of counsel's performance must be highly deferential, and a strong presumption exists that counsel's conduct falls within the wide range of reasonable professional assistance.  See Strickland, 466 U.S. at 689; United States v. Palomba, 31 F.3d 1456, 1466 (9th Cir. 1994).  The trial court found counsel's reasoning to be sound and found no deficiency in counsel's representation.  Similarly, this Court finds counsel's tactical decision to restrict his cross-examination of the two witnesses was within the range of reasonable assistance.

Additionally, no reasonable probability exists that further examination of either such witness would have affected the outcome of the trial.  Similarly, no reasonable probability exists that the outcome would have been different had the trial court clarified for the jury that petitioner did not admit to sodomizing Jane Doe Peoria.  The undisputed fact remained that petitioner was convicted of the rape of Jane Doe Peoria and the rape and sodomy of Jane Doe Elkhart.

Moreover, even without the prior offenses, there was an abundance of persuasive evidence of petitioner's guilt that in no way was implicated by the alleged errors of counsel.[25]

---

[24]The record before this Court contains counsel's explanation as to Jane Doe Elkhart.  (RT 2431-32).  Counsel's explanation as to Jane Doe Peoria is in a sealed state court record that has not been provided to this Court.  In his petition, however, petitioner describes that explanation.  See Pet. at 138-39.  There is no indication that counsel explained to the court why he did not request the jury instructions regarding Illinois law.

[25]Petitioner lists additional asserted deficiencies in counsel's performance, namely: not cross-examining Jane Doe about alleged prior inconsistent statements to the police and hospital staff, not using physical evidence that allegedly would demonstrate that she was not bound and gagged as she described, failing to object to the prosecutor's alleged leading questions and coaching of Jane Doe,

Jane Doe's testimony that her encounter with petitioner was not consensual was corroborated by numerous other sources of evidence.  Her roommate, Officer Rein and Officer Cunningham all testified to her extreme distress on the evening of the incident.  The physical evidence, including the human feces in a newspaper, the garbage bag with the holes in it and the handcuffs, all found near the crime scene, was fully supportive of Jane Doe's testimony.  Her injuries, including the marks on her wrists and neck and the cut on her hand, further corroborated her testimony that petitioner had bound her and put a knife to her neck.  Petitioner's credibility, by contrast, was severely impeached by his prior convictions, as well as the absence of any evidence corroborating his account of his relationship with Jane Doe.  In sum, this was an exceedingly strong case to which petitioner's defense of consent consisted of an unlikely story based solely on his own testimony.

Petitioner further claims that the trial court violated his constitutional rights by failing to grant his motion, pursuant to People v. Marsden, 2 Cal. 3d 118 (1970), to appoint a new attorney.  When a trial court denies a motion to substitute counsel, the inquiry on federal habeas review is whether the petitioner's Sixth Amendment right to counsel was violated.  See Schell v. Witek, 218 F.3d 1017, 1024-25 (9th Cir. 2000) (en banc).  Such a violation occurs if the defendant and his attorney have become embroiled in an "irreconcilable conflict," United States v. Moore, 159 F.3d 1154, 1159-60 (9th Cir. 1998), i.e., a conflict "so great that it result[s] in a total lack of communication or other significant impediment that result[s] in turn in an attorney-client relationship that [falls] short of that required by the Sixth Amendment," Schell, 218 F.3d at 1026.  Here, there is no evidence in the record that petitioner and defense counsel had an irreconcilable conflict.  Indeed, the record indicates that counsel consistently and strenuously advocated for petitioner's position, making numerous objections to the prosecution's evidence and examination of witnesses, moving to limit the cross-examination of petitioner as to his prior convictions, supporting petitioner's

_____

and failing to ask Jane Doe on cross-examination if she had been hypnotized.  Petitioner's recitation of these asserted deficiencies is wholly conclusory in that he does not explain or identify what evidence, if any, existed upon which such cross-examination could have been based.

1  assertion of his Fifth Amendment privilege, requesting limiting instructions, and thoroughly

2  presenting the defense evidence, including petitioner's own testimony.  Although petitioner

3  disagreed with some of his attorney's tactical decisions, those decisions did not amount to

4  ineffective assistance of counsel.  See United States v. Mayo, 646 F.2d 369, 375 (9th Cir.

5  1981 (holding difference of opinion as to trial tactics does not constitute denial of effective

6  assistance).  As there was no conflict or breakdown in the relationship between petitioner and

7  counsel, and petitioner received effective assistance of counsel from his appointed attorney,

8  the denial of his motion to substitute counsel did not deprive him of his Sixth Amendment

9  right to counsel.

10              9.      Ineffective Assistance of Appellate Counsel

11          Petitioner asserts that his appellate counsel provided him with ineffective assistance

12  by failing to raise all of the claims petitioner raises herein.[26]  The Due Process Clause of the

13  Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel

14  on his first appeal.  Evitts v. Lucey, 469 U.S. 387 (1985).  In evaluating such a claim, the

15  federal court applies the standard set forth in Strickland.  Smith v. Robbins, 528 U.S. 259,

16  285 (2000).  In the instant case, appellate counsel raised the Due Process claim petitioner

17  raises herein with respect to the jury instructions concerning his prior sexual offenses.

18  Although appellate counsel did not raise the other claims petitioner raises herein, those

19  claims, as explained above, are without merit.  An appellate lawyer's failure to raise a

20  meritless claim is neither unreasonable nor prejudicial.  Miller v. Keeney, 882 F.2d 1428,

21  1434 (9th Cir. 1989) (noting that one of "hallmarks of effective appellate advocacy" is

22  weeding out weaker issues); see also Jones v. Barnes, 463 U.S. 745, 751 (1983) (holding

23  appellate counsel has no duty to raise every nonfrivolous claim requested by appellant).

24  Accordingly, petitioner did not receive ineffective assistance of appellate counsel nor was he

25

26

27

28          [26]This claim is alleged as the seventeenth claim in the petition.

31

1  prejudiced by the manner in which his appeal was conducted.[27]

2          10.    Cumulative Error

3          Petitioner claims that the cumulative effect of all of the foregoing asserted errors as

4  well as errors made in connection with the Confrontation Clause, discussed infra, caused his

5  trial to be fundamentally unfair, in violation of his right to due process.[28]  Petitioner cites no

6  Supreme Court precedent, and the Court is aware of none, providing that the cumulative

7  effect of numerous alleged errors, no one of which is of constitutional dimension, may

8  violate a defendant's due process right to a fair trial.  As explained above, AEDPA mandates

9  that habeas relief may only be granted if the state courts have acted contrary to or have

10 unreasonably applied federal court as determined by the United States Supreme Court.

11 Williams (Terry) v. Taylor, 529 U.S. 362, 412 (2000) ("Section 2254(d)(1) restricts the

12 source of clearly established law to [the Supreme] Court's jurisprudence.").  In the absence

13 of Supreme Court precedent recognizing a claim of "cumulative error," therefore, habeas

14 relief cannot be granted.

15         In any event, to the extent such a claim has been recognized by the Ninth Circuit,

16 where there is no single constitutional error, nothing can accumulate to the level of a due

17 process violation.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002); Fuller v.

18 Roe, 182 F.23d 699, 704 (9th Cir. 1999).  Here, as explained above and as follows, there has

19 been no constitutional error, and thus, there can be no "cumulative error."  Accordingly,

20 petitioner's claim, even if it had a basis in United States Supreme Court precedent, fails.

21         11.    Evidence of Spontaneous Statements

22         Petitioner claims the trial court's admission of hearsay evidence violated his rights

23

24

25         [27]In his eighteenth claim, petitioner makes the related argument that the appellate court's
26 refusal to appoint different appellate counsel and to strike his appellate counsel's opening brief
   caused him to receive ineffective representation on appeal.  The appellate court did not deprive
27 petitioner of adequate representation because, for the reasons set forth above, his appellate counsel
   did not provide him with ineffective assistance.

28         [28]This claim is alleged as petitioner's sixteenth claim in the petition.

32

1  under the Confrontation Clause of the Sixth Amendment.[29]  The hearsay evidence consisted

2  of testimony by two police officers about statements Jane Doe made to them shortly after the

3  incident.  Specifically, Officer Rein testified with respect to answers Jane Doe gave to

4  various questions Officer Rein posed to her about the crime during interviews at her

5  apartment and at the crime scene.  (RT 1580-1613).  Officer Cunningham testified with

6  respect to statements Jane Doe made about the crime during her rape examination.  (RT

7  1545-46).  The trial court found Jane Doe's statements to be hearsay, in that they were

8  offered for their truth, but held the statements fell within the exception for spontaneous

9  statements provided by California Evidence Code § 1240 because the statements were made

10  within an hour to an hour and a half after the incident and while Jane Doe was still under the

11  stress of the assault.[30]  (RT 1617-18).

12          The Confrontation Clause does not bar the admission of hearsay statements where the

13  declarant testifies at trial and is subject to cross-examination.  See Crawford v. Washington,

14  541 U.S. 36, 59-60 n. 9 (2004).  Here, the declarant, Jane Doe, testified at trial and not only

15  was available for cross-examination but in fact was extensively cross-examined.[31]

16  Consequently, the testimony of Officers Rein and Cunningham about Jane Doe's out-of-court

17  statements was not barred by the Confrontation Clause, and, accordingly, this claim fails.

18          12.    Evidence of Prior Sexual Offenses

19          Petitioner contends the admission of evidence concerning his prior sexual offenses,

20  pursuant to California Evidence Code § 1108, violated his right to due process.[32]  A state

21  _____

22          [29]This claim is alleged as the nineteenth claim in the petition.

23          [30]Petitioner argues that the trial court was incorrect in finding the statements admissible under
   § 1240.  Such argument is based on an alleged error of state law and, consequently, is not a
24  cognizable basis for federal habeas relief.  See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999)
   (holding violation of state rules of evidence not proper basis for granting federal habeas relief).

25          [31]Although Jane Doe testified and was cross-examined before Officers Rein and Cunningham
26  took the stand, the Court is aware of no authority suggesting such chronology places her outside the
   exception recognized in Crawford.  Indeed, had petitioner thereafter wished to cross-examine Jane
27  Doe about the statements, he could have called her back to the stand during either the prosecution's
   or defense case.

28          [32]This claim is alleged as the twentieth claim in the petition.

court's admission of evidence infringes a defendant's constitutional right to due process if the evidence rendered the trial fundamentally unfair.  See Pulley, 465 U.S. at 41.  California Evidence Code §1108 provides, in relevant part:

> In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352.[33]

Petitioner does not, nor could he, claim the admission of his prior sexual offenses violated § 1108.  Rather, he challenges the constitutionality of § 1108 itself.  Specifically, petitioner claims § 1108, by allowing evidence of prior sexual offenses to be introduced for the purpose of demonstrating a defendant's propensity to commit the charged sexual offense, violates the right to due process.  See People v. Fitch 455 Cal. App. 4th 172 (1997) (stating purpose of § 1108 is to allow jury to consider prior sexual offenses as evidence of defendant's propensity to commit charged sexual offense).[34]  Although the United States Supreme Court has not addressed the specific question of whether § 1108 violates the Due Process Clause, various circuit courts have found the admission of prior sexual offenses under parallel federal evidentiary rules, for the purpose of showing propensity, comport with due process.  See Fed. R. Evid. 413, 414; United States v. LeMay, 260 F.3d 1018, 1024-25, 1031 (9th Cir. 2001) (holding federal rules of evidence allowing evidence of prior sexual offenses to show propensity to commit charged offense do not violate Due Process Clause); accord United States v. Enjady, 134 F.3d 1427, 1433 (10th Cir. 1998); United States v. Mound, 149 F.3d 799, 801 (8th Cir. 1998).[35]

---

[33]Section 1101 provides in relevant part: "Except as provided . . . in Section[] 1108 . . ., evidence of a person's character or trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion.  Cal. Evid. C. § 1101(a).  Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[34]A determination of state law by a state appellate court is binding in a federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629 (1988).

[35]Such determination is dependent in part on the availability of Rule 403, under which evidence of propensity may be excluded if its prejudicial effect outweighs its probative value.  See LeMay, 260 F.3d at 1031.  As noted, the California Evidence Code provides a similar safeguard.  See

1    Accordingly, it was neither an unreasonable application of nor contrary to federal law

2  for the state courts to find petitioner's due process rights had not been violated by the

3  admission in evidence of petitioner's prior sexual offenses.

**CONCLUSION**

5    For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

6    Any pending motions are hereby terminated.

7    The Clerk shall close the file.

8    IT IS SO ORDERED.

9  DATED: June 12, 2006

10                                   MAXINE M. CHESNEY
                                     United States District Judge

---

Cal. Evid. Code §§ 352, 1108.